# 23-0012-cv

## United States Court of Appeals
*for the*
## Second Circuit

———◆———

JACKPOCKET, INC.,

*Plaintiff-Appellant,*

— v. —

LOTTOMATRIX NY LLC, LOTTOMATRIX CORPORATION,
LOTTOMATRIX OPERATIONS LIMITED, aka JACKPOT.COM,
LOTTOMATRIX MALTA LIMITED, 99DYNAMICS LIMITED,

*Defendants-Appellees,*

LOTTO.COM, INC.,

*Intervenor.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR DEFENDANTS-APPELLEES
## (REDACTED VERSION)

WILLIAM B. ADAMS
TODD ANTEN
RACHEL E. EPSTEIN
DYLAN I. SCHER
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
51 Madison Avenue, 22nd Flr.
New York, New York 10010
(212) 849-7000

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellees are privately held companies and no publicly held corporation owns 10% or more of any of their stock.

- Defendant-Appellee Lottomatrix NY LLC is wholly owned by Defendant-Appellee Lottomatrix Corporation.

- Defendant-Appellee Lottomatrix Corporation is wholly owned by Defendant-Appellee Lottomatrix Malta Limited.

- Defendant-Appellee Lottomatrix Operations Limited d/b/a Jackpot.com is wholly owned by Lottomatrix Malta Limited.

- Defendant-Appellee Lottomatrix Malta Limited is wholly owned by Defendant-Appellee 99Dynamics Limited.

- Defendant-Appellee 99Dynamics Limited has no corporate parent.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT .......................................................... 1

COUNTER-STATEMENT OF ISSUES .............................................. 4

COUNTER-STATEMENT OF THE CASE ......................................... 5

    A.    Jackpot.com's Lottery And iGaming Business Since 2012 ................ 5

    B.    The Ubiquity Of The Word "Jackpot" In The iGaming And
           Lottery Industry .............................................................................. 7

    C.    Plaintiff's Creation And Marketing Of JACKPOCKET ................. 8

           1.    Plaintiff's Delayed Launch .................................................. 8

           2.    Plaintiff's Intentional Association Between The
                 JACKPOCKET Mark And The Word "Jackpot" ................. 9

           3.    Plaintiff's Expansion Into The iGaming Market ............... 11

           4.    Plaintiff's Recent Advertising And Sales ......................... 12

    D.    Plaintiff's Efforts To Monopolize The Lottery Courier Services
           Industry And The Word "Jackpot" ................................................ 14

           1.    Plaintiff's Attempt To Acquire Jackpot.com ................... 14

           2.    Plaintiff's Anti-Competitive Conduct .............................. 14

           3.    Plaintiff's After-The-Fact Attempts To Create Confusion
                 With Jackpot.com ............................................................. 16

    E.    The District Court's Decision ....................................................... 16

SUMMARY OF ARGUMENT ........................................................ 20

STANDARD OF REVIEW ............................................................. 22

ARGUMENT ................................................................................. 25

I.     THE DISTRICT COURT CORRECTLY FOUND THAT THE
      PARTIES' MARKS ARE NOT SIMILAR ................................ 26

    A.    The District Court Properly Identified The Relevant Logos For
           Comparison ................................................................................. 27

B. The District Court Correctly Found That The Marks, Considered In Context, Have Significant Material Dissimilarities ........................................................................29

II. THE DISTRICT COURT CORRECTLY FOUND THAT THE JACKPOCKET MARK IS WEAK ..............................................................34

A. The District Court Correctly Found That The JACKPOCKET Mark Is Inherently Weak ........................................................34

1. Substantial Evidence Supports The District Court's Finding Of Inherent Weakness ...................................36

2. The District Court Considered The Proper Market And The Complete Mark ..................................41

3. Plaintiff's Incorporation Of A Common Term Warrants A Narrow Scope Of Protection ................................46

B. The District Court Correctly Found The JACKPOCKET Mark Commercially Weak .............................................46

1. Plaintiff Does Not Challenge Most Of The District Court's Findings Against Acquired Strength ...........................47

2. The District Court Correctly Found Plaintiff's Evidence Of Advertising Expenditures And Revenues Was Not Probative Of Acquired Strength ................................49

III. THE DISTRICT COURT PROPERLY DISCOUNTED PLAINTIFF'S EVIDENCE OF ACTUAL CONFUSION ...........................55

A. The District Court Applied The Correct Legal Standard For Actual Confusion ..................................................55

B. The District Court Properly Analyzed The Purported Instances Of Confusion ....................................................57

C. The District Court Properly Concluded This Factor Favors Jackpot.com .......................................................62

CONCLUSION ...............................................................................64

CERTIFICATE OF COMPLIANCE ................................................65

CERTIFICATE OF SERVICE .........................................................66

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*27-24 Tavern Corp. v. Dutch Kills Central*,
  2015 WL 5772158 (E.D.N.Y. Sept. 29, 2015) ................................................62

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found.
  of Am., Inc.*,
  307 F. Supp. 3d 260 (S.D.N.Y. 2018) ........................... 35, 47, 50, 51, 55, 56, 61

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*,
  305 U.S. 315 (1938)........................................................................45

*Arrow Fastener Co. v. Stanley Works*,
  59 F.3d 384 (2d Cir. 1995) .................................................................22

*Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*,
  945 F.3d 53 (2d Cir. 2019) .................................................................24

*Banff, Ltd. v. Federated Dept. Stores, Inc.*,
  841 F.2d 486 (2d Cir. 1988) ...............................................................40

*Bausch & Lomb Inc. v. Nevitt Sales Corp.*,
  810 F. Supp. 466 (W.D.N.Y. 1993)..........................................................53

*Beech-Nut, Inc. v. Warner-Lambert Co.*,
  480 F.2d 801 (2d Cir. 1973) ...............................................................43
  346 F. Supp. 547 (S.D.N.Y. 1972) ..........................................................46

*BigStar Ent., Inc. v. Next Big Star, Inc.*,
  105 F. Supp. 2d 185 (S.D.N.Y. 2000) ..................................................46, 50

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
  554 F. Supp. 3d 606 (S.D.N.Y. 2020) .......................................................49

*Brennan's Inc. v. Brennan's Rest., L.L.C.*,
  360 F.3d 125 (2d Cir. 2004) ...............................................................26

*Brown v. Quiniou*,
  744 F. Supp. 463 (S.D.N.Y. 1990) ..........................................................62

iv

*Capri Sun GmbH v. Am. Bev. Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022) ............................................................54, 55

*Car-Freshner Corp. v. Am. Covers, LLC*,
980 F.3d 314 (2d Cir. 2020) ............................... 23, 39, 42, 47, 51, 62

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*,
830 F.2d 1217 (2d Cir. 1987) ....................................................................52

*Charles of Ritz Grp. Ltd. v. Quality King Distributors, Inc.*,
832 F.2d 1317 (2d Cir. 1987) ....................................................................51

*Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*,
201 F. Supp. 3d 428 (S.D.N.Y. 2016) ..................................................45

*Conn. Cmty. Bank v. Bank of Greenwich*,
578 F. Supp. 2d 405 (D. Conn. 2008)..........................................54, 55

*Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*,
125 F.3d 28 (2d Cir. 1997) .........................................................................33

*Cross Com. Media, Inc. v. Collective, Inc.*,
841 F.3d 155 (2d Cir. 2016) ............................................................35, 44

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*,
440 F. Supp. 2d 249 (S.D.N.Y. 2006) ..................................................60

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
2014 WL 814532 (S.D.N.Y. Mar. 3, 2014).........................................48

*Doral Conf. Ctr. Assocs. v. Southbury Hotel Assocs.*,
1987 WL 11173 (S.D.N.Y. May 8, 1987) .............................................58

*Easy Spirit  LLC v. Skechers U.S.A., Inc.*,
571 F. Supp. 3d 185 (S.D.N.Y. 2021) ..................................................63

*Estee Lauder Inc. v. Gap, Inc.*,
108 F.3d 1503 (2d Cir. 1997) ............................................................25, 39

*Ferran v. Town of Nassau*,
471 F.3d 363 (2d Cir. 2006) .....................................................................63

*Fossil Inc. v. Fossil Grp.*,
    49 U.S.P.Q.2d 1451 (T.T.A.B. 1998) ................................................... 54

*Freedom Holdings, Inc. v. Cuomo*,
    624 F.3d 38 (2d Cir. 2010) ...................................................................... 24

*GamerModz, LLC v. Golubev*,
    2011 WL 4755026 (M.D. Fla. Aug. 3, 2011) ...................................... 52

*Giggle, Inc. v. netFocal, Inc.*,
    856 F. Supp. 2d 625 (S.D.N.Y. 2012) .............................................. 50

*Giorgio Beverly Hills, Inc. v. Revlon Consumer Prod. Corp.*,
    869 F. Supp. 176 (S.D.N.Y. 1994) ................................................... 63

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993) ...................................... 23, 26, 31, 40

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
    826 F.3d 27 (2d Cir. 2016) ................................................................... 24

*Hamilton Int'l Ltd. v. Vortic LLC*,
    13 F.4th 264 (2d Cir. 2021) ......................................................... 22, 24

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
    858 F.2d 70 (2d Cir. 1988) ................................................................... 44

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
    2 F.4th 1150 (9th Cir. 2021) ............................................................... 52

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*,
    478 F. Supp. 2d 340 (E.D.N.Y. 2007) .................................. 47, 61, 62

*Joules Ltd. v. Macy's Merch. Grp., Inc.*,
    695 F. App'x 633 (2d Cir. 2017) ................................ 23, 31, 32, 64
    2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016) ................................... 57

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
    930 F. Supp. 2d 489 (S.D.N.Y. 2013) ............................................ 51

*Krist v. Kolombos Rest. Inc.*,
    688 F.3d 89 (2d Cir. 2012) ................................................................... 24

vi

*Lang v. Ret. Living Publ'g Co.*,
    949 F.2d 576 (2d Cir. 1991) .......................................... 31, 35, 39, 40, 55, 56, 57

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005) .................................................................32

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    454 F.3d 108 (2d Cir. 2006) .......................................................30, 31, 34, 51

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016) ......................................................48, 61

*Merriam-Webster, Inc. v. Random House, Inc.*,
    35 F.3d 65 (2d Cir. 1994) .................................................................62

*MidCap Business Credit, LLC v. MidCap Financial Trust*,
    2022 WL 17175400 (2d Cir. Nov. 23, 2022) ...................................................34

*Morgans Grp. LLC v. John Doe Co.*,
    2012 WL 1098276 (S.D.N.Y. Mar. 31, 2012)...................................................48

*Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*,
    182 F.3d 133 (2d Cir. 1999) ...............................................................22, 56, 62

*Museum of Mod. Art v. MOMACHA IP LLC*,
    339 F. Supp. 3d 361 (S.D.N.Y. 2018) ......................................................29

*Nabisco, Inc. v. Warner-Lambert Co.*,
    220 F.3d 43 (2d Cir. 2000) .................................................................32

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001) .............................................................25, 32, 59

*Oakland Chem. Co. v. Bookman*,
    22 F.2d 930 (2d Cir. 1927) .................................................................45

*Original Appalachian Artworks v. Granada Elecs., Inc.*,
    640 F. Supp. 928 (S.D.N.Y. 1986) ...................................................51

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.*,
    996 F.2d 577 (2d Cir. 1993) .............................................................31

vii

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
  317 F.3d 209 (2d Cir. 2003) ...............................................................24

*Playboy Enters. v. Chuckleberry Publ'g, Inc.*,
  486 F. Supp. 414 (S.D.N.Y. 1980) ....................................................27

*Playtex Prod., Inc. v. Georgia-Pac. Corp.*,
  390 F.3d 158 (2d Cir. 2004) ...............................................................44

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) ...............................................................17

*Procter & Gamble Co. v. Johnson & Johnson Inc.*,
  485 F. Supp. 1185 (S.D.N.Y. 1979) ...........................................46, 47

*Reed Elsevier, Inc. v. Who's Who Worldwide Registry, Inc.*,
  122 F.3d 1057 (2d Cir. 1995) .............................................................51

*Reply All Corp. v. Gimlet Media, LLC*,
  843 F. App'x 392 (2d Cir. 2021) .......................................26, 31, 33

*RiseandShine Corp. v. PepsiCo, Inc.*,
  41 F.4th 112 (2d Cir. 2022) ............ 2, 3, 18, 21-23, 25, 26, 30, 32-36, 38-40, 43
  ............................................................................. 45-46, 50, 54, 64
  2023 WL 4936000 (S.D.N.Y. Aug. 2, 2023)................................50, 64

*Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*,
  894 F. Supp. 2d 288 (S.D.N.Y. 2012) ...............................................50

*Savin Corp. v. Savin Grp.*,
  391 F.3d 439 (2d Cir. 2004) ...............................................................62

*Scarves by Vera, Inc. v. Todo Imps. Ltd.*,
  544 F.2d 1167 (2d Cir. 1975) .............................................................40

*Star Indus., Inc. v. Bacardi & Co.*,
  412 F.3d 373 (2d Cir. 2005) .........................................................23, 62

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*,
  851 F.3d 440 (5th Cir. 2017) ..............................................................56

*Streetwise Maps, Inc. v. VanDam, Inc.*,
  159 F.3d 739 (2d Cir. 1998) .......................................25, 30, 39, 40, 62

*Tiffany & Co. v. Costco Wholesale Corp.*,
   971 F.3d 74 (2d Cir. 2020) ............................................................23, 24

*Two Hands IP LLC v. Two Hands Am., Inc.*,
   563 F. Supp. 3d 290 (S.D.N.Y. 2021) ................................................49

*W.E. Bassett Co. v. Revlon, Inc.*,
   435 F.2d 656 (2d Cir. 1970) .........................................................40, 41

*W. Publ'g, Co. v. Rose Art Indus. Inc.*,
   910 F.2d 57 (2d Cir. 1990) ...........................................................43, 64

*W.W.W. Pharm. Co. v. Gillette Co.*,
   984 F.2d 567 (2d Cir. 1993) .........................................................39, 40

*Water Pik, Inc. v. Med-Systems, Inc.*,
   726 F.3d 1136 (10th Cir. 2013) .........................................................38

*WIZKIDS/NECA, LLC v. TIII Ventures, LLC*,
   2019 WL 1454666 (S.D.N.Y. Mar. 31, 2019).............................40, 63

## Additional Authorities

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION
   §11:31 ............................................................................................45
   §11:81 ............................................................................................49
   §32:189 ..........................................................................................63

# PRELIMINARY STATEMENT

This appeal arises from a well-reasoned 140-page decision after bench trial by the U.S. District Court for the Southern District of New York (Liman, J.), denying Plaintiff-Appellant Jackpocket, Inc.'s demand for a permanent injunction that would have allowed it to abuse trademark law by stopping a competitor from using a common, descriptive term. That ruling and the resulting judgment in favor of Defendants-Appellees (collectively, "Jackpot.com") are entirely correct.

Plaintiff—owner of the trademark JACKPOCKET in connection with lottery courier services—sought to enjoin its competitor Jackpot.com, which has used the name JACKPOT.COM in Europe for over a decade in connection with lottery and gaming services, from using that same mark in the United States. Over three days, the district court heard testimony from three fact witnesses and eight expert witnesses and admitted over 800 exhibits, culminating in detailed findings of fact and conclusions of law in which the court ruled that Jackpot.com's use of JACKPOT.COM does not infringe JACKPOCKET.

It was not even close. The court concluded that Plaintiff's decision to use a weak mark incorporating the descriptive term "jackpot" for lottery-related services cannot be used as an anti-competitive cudgel:

> Plaintiff chose a mark that both inherently and in its use suggests the product that Plaintiff offers: lottery tickets. Plaintiff has not presented sufficient evidence that it has devoted resources to developing a distinct brand identity so that its trademarks are associated with their

source. … Rather, an injunction would prevent Defendants from using a mark that they have long used internationally and that is generally descriptive of the product that both Plaintiff and Defendants offer, and thus it would impermissibly impede competition. Competition is not the evil that the Lanham Act was designed to guard against, and the Court refuses to use trademark law for that purpose.

SPA127.

On appeal, Plaintiff asks this Court to review just three of the eight *Polaroid* factors the district court considered, and then principally raises factual challenges. This Court should not second guess the district court's careful findings.

This Court is not starting on a blank slate; the outcome is dictated by *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112 (2d Cir. 2022), which **reversed** an injunction largely because the plaintiff's use of the word "rise" in its mark was descriptive of the product's perceived virtue (there, coffee), so the mark was weak. So too here: The word "jackpot" is ubiquitous in the lottery and iGaming fields, describing a core attribute of the product. Such "[w]eak marks are entitled to only an extremely narrow scope of protection, unless a convincing combination of other *Polaroid* factors militates strongly in favor of likelihood of confusion." *Id.* at 124 (quotations omitted). Because Plaintiff made no such "strong" showing, this Court should affirm.

*First*, the court properly found the parties' marks are not similar. It found that, when "[a]nalyzing the two logos in context, … there is a low likelihood of confusion between the source." SPA96-97. And when reviewed in context of their

full webpages, "there are fewer similarities." SPA97. The only real "similarity" is that both incorporate "jackpot," but "without more striking visual similarities, the shared use of this ordinary word, used to signify a virtue of the product, is not enough" to tilt this factor. *RiseandShine*, 41 F.4th at 124-25. Plaintiff has not demonstrated the court disregarded such "striking visual similarities," let alone clearly erred.

*Second*, the court correctly found JACKPOCKET is conceptually and commercially weak. As to conceptual strength, when a plaintiff chooses a word commonly used "in a crowded field" that "is so tightly linked with the perceived virtues" of its service, "the mark is inherently weak and commands a narrow scope of protection." *Id.* at 122, 125. Plaintiff's marks "are weak because they incorporate the word 'jackpot,' the very purpose of a lottery, in a conspicuous manner and do not contain sufficient additional content to create distance between the mark and the product it is describing." SPA70. Plaintiff conceded at trial it intentionally incorporated the word "jackpot" into its mark to convey a "jackpot in your pocket." The court did not err—let alone clearly—in finding the mark weak.

The court also correctly concluded Plaintiff did not demonstrate that any acquired strength overcame this conceptual weakness. Plaintiff does not challenge the court's findings on multiple factors weighing against acquired strength, limiting its gripes to the court's factual assessment of Plaintiff's advertising

expenditures and revenue. But the court correctly found nearly all those expenditures and revenue came within the last two years, and Plaintiff did not connect that spending or revenue to consumer association with its brand.

*Third*, the court properly found Plaintiff's grab-bag of supposed instances of actual confusion were unpersuasive. Plaintiff did not introduce direct customer testimony or a valid survey. And as to its handful of anecdotes, the court rightly recognized: (1) examples ***pre***-dating Jackpot.com's entry into the U.S. market are not probative, most likely reflecting typographical errors stemming from Plaintiff's choice to employ a weak mark; and (2) examples ***post***-dating Jackpot.com's U.S. entry largely involved individuals with pre-established relationships that do not reflect relevant consumers' views. The court did not err in finding any actual confusion to be, at most, *de minimis*.

## COUNTER-STATEMENT OF ISSUES

1.    Whether the similarity-of-the-marks factor does not favor Plaintiff given how the marks appear and are used in the marketplace.

2.    Whether the strength-of-the-mark factor favors Jackpot.com because: (a) Plaintiff's JACKPOCKET mark is inherently weak, based on the incorporation of the common descriptive term "jackpot"; and (b) Plaintiff's evidence of acquired strength was insufficient to overcome the mark's inherent weakness.

3.     Whether Plaintiff's anecdotal evidence showed, at most, *de minimis* actual confusion.

## COUNTER-STATEMENT OF THE CASE

### A.     Jackpot.com's Lottery And iGaming Business Since 2012

Jackpot.com is a United Kingdom-based business that has operated since 2012.  SPA24.  Jackpot.com offers services related to lottery and iGaming (sometimes referred to as "real money gaming"), with over 800,000 registered customers in 184 countries.  SPA25 (citing Dkt.175-142 (¶¶5, 22, 25)).

Jackpot.com owns the domain name www.jackpot.com, which its founders purchased in 2012 for $500,000 plus fees.  SPA24 (citing Dkt.175-142 (¶16), Dkt.185-2, Dkt.178_at_207-09).  Since April 2012, the www.jackpot.com website has been continuously accessible worldwide, with numerous visitors from the United States.  SPA25-26 (citing Dkt.175-142 (¶¶30-31)).  From 2012 to 2016, the www.jackpot.com domain was used as a "white-label" casino through which U.K. customers could find links to casino games offered by other websites, as well as a portal through which consumers elsewhere—including in the United States—could obtain information about iGaming and lottery services.  SPA24 (citing Dkt.178_at_207-09); Dkt.175-142 (¶¶17-18).

In 2016, Jackpot.com began operating what is now recognized as the Jackpot.com business, offering several licensed iGaming and lottery products.

SPA24 (citing Dkt.175-142 (¶24)); Dkt.175-142 (¶¶19-21, 23). Since December 2016, Jackpot.com's consumer-facing business had used its "Jackpot.com" name and bubble-lettering logo, including on its website and app:



SPA25; Dkt.175-142 (¶¶21, 23). "Jackpot.com" remains the ***only*** company name, and the bubble-lettering logo remains the ***only*** logo, that Jackpot.com has used. Dkt.175-142 (¶23).

Although Jackpot.com has planned to offer products in the United States since 2012, it did not immediately do so because it understood the online purchase of lottery tickets through third-party operators (*i.e.*, "lottery courier services") was not yet clearly legal here. SPA27 (citing Dkt.175-142 (¶¶28-29, 34)).

In late 2020 and early 2021, when Jackpot.com became aware of favorable regulatory and legal changes, it began taking steps to offer lottery courier services

in the United States.  SPA27-28; Dkt.175-142 (¶¶32, 34-36, 54, 83).  In April 2021, Jackpot.com redesigned the www.jackpot.com page for U.S.-based visitors, notifying them of its plans and allowing for early sign-ups.  SPA28.  By June 2022, the domain had more than 62,000 U.S.-based visitors and more than 11,000 U.S.-based sign-ups.  SPA27-28.  In May 2022, Jackpot.com publicly announced it was hiring a CEO for North American operations.  SPA32 (Dkt.175-142 (¶56)).

**B.      The Ubiquity Of The Word "Jackpot" In The iGaming And Lottery Industry**

Jackpot.com is not the only lottery and iGaming business to use the word "jackpot."  As the court found, "jackpot" is commonly used in those fields to describe a prominent, core feature of their services—a jackpot—and there is "evidence of both a substantial number of registrations of marks containing the word 'jackpot' in related markets and of significant use of some of those marks." SPA76.

As of October 2022, there were over 370 live trademark registrations for marks that include "jackpot."  SPA40 (citing DX-250, DX-270).  Of those, 145 used "lottery" in describing their goods and services.  SPA76 (citing DX-251, DX-257); DX-250; DX-256 (over 270 registrations with "jackpot" for "gaming").

Such prolific use makes sense because "jackpot" "denotes the top prize in a game of chance [and] is used in connection with gambling of all kinds, including lotteries."  SPA40 (citing Dkt.175-142 (¶¶9-10), Dkt.175-148_at_5).  In fact, the

U.S. Patent and Trademark Office ("PTO") granted many of these registrations "on the condition that the trademark owner disclaim the exclusive right to use 'jackpot' outside of the trademark." SPA40 (citing Dkt.49_Ex._J); *see, e.g.*, DX-177.

The court also credited evidence that "some of these marks have been used extensively in commerce." SPA41. Just ten examples of gaming apps with "jackpot" in the name reported more than 25 million downloads and more than 2 million customer reviews. SPA40-41, SPA76 (citing DX-214-23); DX-232-249 (millions of additional downloads of other "jackpot" apps). The court also credited evidence of third-party use of "jackpot" based on documents subpoenaed from the "social casino-style" app JACKPOT MAGIC SLOTS, which earned "████ ███████████████ of revenue," had nearly █████████ downloads, and spent ████ █████ on marketing and advertising. SPA41, SPA77 (citing DX-281 (¶¶8-10), DX-274).

### C. Plaintiff's Creation And Marketing Of JACKPOCKET

#### 1. Plaintiff's Delayed Launch

Plaintiff, which offers lottery courier services, was founded in 2013 (SPA7), but "had a rocky start in the internet lottery business" (SPA8). At first, it offered its services only in New York. SPA8 (citing Dkt.175-22 (¶15), Dkt.178_at_36-37). In November 2016, the New York State Gaming Commission revoked Plaintiff's lottery license; as a result, Plaintiff's New York lottery courier services

ceased until 2021. SPA8; Dkt.175-154_at_32-33, 38-40; Dkt.188-6(DX-106)_at_1-2. While New York sat dormant, Plaintiff began offering services in Minnesota and New Hampshire in 2017, before later offering services in 2019 in New Jersey, Texas, and Washington, D.C. SPA9.

### 2. Plaintiff's Intentional Association Between The JACKPOCKET Mark And The Word "Jackpot"

Since its inception, Plaintiff has intentionally associated the JACKPOCKET brand with the word "jackpot." As the court found, in selecting JACKPOCKET as its brand, Plaintiff's founder and CEO Peter Sullivan purposely combined the word "jackpot" with the word "pocket" to convey to consumers the idea of having a "jackpot in your pocket," and Plaintiff promoted that connection in ads. SPA12 (citing Dkt.175-22 (¶12), Dkt.178_at_43, 46); SPA14 (2018 advertisement); Dkt.175-154_at_77, Dkt.175-154_at_107; Dkt.178_at_44. In addition, the "[m]ore recent advertisements by [Plaintiff] focus heavily on the 'jackpot' message of 'Jackpocket,' by emphasizing the size of the jackpots offered by different lotteries," including sometimes "at the expense of Jackpocket's mark." SPA14-16 (citing Dkt.175-22(¶¶25, 27), Dkt.181-31_at_810-11, Dkt.175-62_PX-378_Ex._9_1:30); *see, e.g.*, DX-385, DX-386 (examples of advertising).

As the court found, "some of Plaintiff's spending has been used to attempt to tighten the connection between JACKPOCKET as a mark and the generic word 'jackpot.'" SPA87-88. For example, upon opening Plaintiff's app, the user does

not first see the word "Jackpocket" or anything identifying the source, but rather first sees the word "**JACKPOT**," which then expands into the full JACKPOCKET mark:



SPA87-88 (citing Dkt.175-22 (¶54), Dkt.181-53(Ex.30)). In a 2018 investor presentation, Plaintiff confirmed this "animation that highlights the play on words that Jackpocket was formed from" was part of its "new approach to [its] wordmark." SPA88 (citing DX-302_at_060). Plaintiff also used advertising dollars to purchase variations of "jackpot" from Google AdWords and App Search Ads to drive traffic to its website, including the bulk of its search purchases on Apple's app store. SPA88 (citing Dkt.178_at_46-49, Dkt.175-121(DX-088)). At trial, Mr. Sullivan admitted Plaintiff continues to ***intentionally*** tie its mark to the word "jackpot." Dkt.178_at_44-45.

### 3.  Plaintiff's Expansion Into The iGaming Market

Plaintiff has always presented itself as part of the broader iGaming market, with its brand encompassing far more than lottery courier services.  As the court found, Plaintiff "has been looking to expand its presence beyond lottery courier services into *additional* iGaming services … since at least 2015," emphasizing this expansion goal during several fundraising efforts.  SPA28 (emphasis added).  For example, Plaintiff's fundraising presentation included the "Big Vision" below, depicting its "lottery product" as the "anchor tenant" of the "mall of mobile real money gaming" that its JACKPOCKET brand covers:



Dkt.185-40(DX-039); DX-315_at_'958.  As the court acknowledged, Plaintiff continues to pursue "its goal of expanding beyond lottery courier services," including by signing a "partnership with Caesars [casino]."  SPA28-29 (citing DX-

316, DX-346). Mr. Sullivan conceded at trial that Plaintiff is part of the broader online real money gaming industry. Dkt.178_at_7-10.

### 4. Plaintiff's Recent Advertising And Sales

**Advertising.** As the court found, "the bulk" of Plaintiff's "advertising has come only in recent months." SPA81 (citing Dkt.175-59(Wong_Decl._Ex._2)); *see* SPA12-13 (similar). "In particular, nearly ▮ of Plaintiff's gross advertising expenditures came since 2020, and ▮ came in the first ten months of 2022, after Jackpocket became aware of Jackpot.com's competitive threat." SPA81 (citing Dkt.175-59(Wong_Decl._Ex.2)); *see* SPA13 ("bulk" of advertising "has come during the past two years").[1] While Plaintiff claimed to have spent ▮ in advertising from 2013 through early November 2022 (SPA12), the court found: (1) there is "no evidence" of any advertising spend from "founding through 2017"; (2) Plaintiff "spent only ▮ of the ▮ … from 2017 through 2020"; and (3) "approximately ▮ of [Plaintiff's] total marketing expenditures since inception … has been spent in New York since 2021." SPA13 (citing Dkt.175-59(Wong_Decl._Ex.2), Dkt.175-85_at_203-04).

The court also recognized Plaintiff's marketing spends "follow the ebbs and flows of state lottery jackpots." SPA13 (citing Dkt.175-58 (¶14)). For example, in

---

[1] Not all marketing expenditures were for advertising. SPA12 (citing Dkt.175-85_at_158-59).

2022, Plaintiff spent more on marketing when Mega Millions or Powerball lotteries were large, "to take advantage of that extremely high top prize." SPA13 (citing Dkt.175-58 (¶14)). Crediting the analysis of Jackpot.com's marketing expert, the court further found most of Plaintiff's advertising is "traffic steering," which is "used to direct Internet traffic to a web site or application ***without relying on or building upon the brand's unique features***," and that it emphasizes the potential jackpot, as opposed to the JACKPOCKET brand. SPA81-82 (emphasis added) (citing Dkt.175-146 (¶28), Dkt.175-22 (¶¶25, 27)); *see* SPA17.

**Revenue.** The court also found that most of Plaintiff's revenue is recent. SPA9-10, SPA82 (citing Dkt.175-59(Wong_Decl._Ex.2)). Plaintiff's sales closely track the size of lottery jackpots—for example, approximately ▮ of Plaintiff's 2022 gross sales were made over only ***eight days*** when the Powerball jackpot exceeded $1.5 billion. SPA9, SPA83 (citing Dkt.175-58 (¶¶14, 29), PX-363). These ebbs and flows also track the days Plaintiff's app had high rankings in overall downloads or trending hashtags. SPA9-10 (citing Dkt.175-58 (¶27), PX-374, PX-375, PX-376, PX-479). The court additionally found Plaintiff "is not a significant market participant in the lottery market generally." SPA84.

**D. Plaintiff's Efforts To Monopolize The Lottery Courier Services Industry And The Word "Jackpot"**

**1. Plaintiff's Attempt To Acquire Jackpot.com**

From December 2021 through spring 2022, Plaintiff had discussions with Jackpot.com about potential acquisition. SPA29-32 (citing Dkt.175-22 (¶¶57-75), Dkt.175-142 (¶¶37-49)). As part of these discussions, Jackpot.com's co-founder and CEO Yariv Ron sent Plaintiff diligence materials, including an "Investor Presentation" describing Jackpot.com's plan to offer lottery courier services under its "Jackpot.com" brand in fifteen U.S. states and the District of Columbia by the end of 2023. SPA30 (citing Dkt.175-142 (¶¶43-46), Dkt.175-90(DX-015)). Mr. Sullivan (Plaintiff's CEO) discussed this potential acquisition with his Board of Directors on multiple occasions. SPA30 (citing Dkt.175-22 (¶75)).

The court found Plaintiff "was concerned … about the competitive threat" posed by Jackpot.com, which was "expressed in the form of a desire to obtain the 'jackpot.com' name or more precisely, to foreclose Jackpot.com from using that name"—including because Mr. Sullivan testified he was attracted to the brand name "Jackpot.com." SPA31 (citing Dkt.178_at_123-25; Dkt.185-46); *see* SPA31 (citing Dkt.178_at_111, 123, Dkt.185-46, Dkt.185-30_at_'173).

**2. Plaintiff's Anti-Competitive Conduct**

Plaintiff repeatedly took steps to prevent competitors, including Jackpot.com, from offering lottery courier services in the United States. Plaintiff

"lobbied regulators and state governments to encourage them not to sign licenses or otherwise do business with Jackpot.com and to block Jackpot.com from entering the U.S. lottery-courier-service market." SPA34 (citing Dkt.178_at_158-59, Dkt.175-95_at_'04216-19). For example, Plaintiff sent "a report about Jackpot.com"—which it titled "bad actor stuff"—to the New York State Gaming Commission and the New York Lottery. SPA34. Plaintiff's Vice President of Public Affairs admitted Plaintiff was "in the process of trying to kill a bunch of these [aspiring lottery courier] guys right now." Dkt.175-110 (cited in SPA35). Plaintiff also tried to "enlist Texas regulators to help prevent Jackpot.com from reaching a sponsorship agreement with ███████████." SPA34 (citing Dkt.178_at_160-61, Dkt.175-116(DX-074) (Mr. Sullivan: "let's block these assholes"), Dkt.175-95_at_'04230). This is not surprising given Plaintiff's acknowledgment that its business model is to "████████████████████████ ███████ and to ████████████. Dkt.175-103_at_'043.

These efforts worked: Plaintiff had a monopoly or near-monopoly in the lottery courier services industry in the states in which it operated. For example, at the time of trial, Plaintiff had just one competitor in the New York and New Jersey markets. SPA12.

### 3. Plaintiff's After-The-Fact Attempts To Create Confusion With Jackpot.com

On May 23, 2022, Plaintiff sent Jackpot.com a cease-and-desist letter complaining for the first time about Jackpot.com's name. SPA33-34 (citing Dkt.181-64, Dkt.188-51). On the *same day*, Plaintiff filed a new trademark application for JACKPOCKET.COM and then "took steps to align its branding with Jackpot.com's *by adding a '.com'* at the end of the logo on its website." SPA33-34 (emphasis added) (citing Dkt.185-50, Dkt.185-51).



SPA34.

The court found Plaintiff's modification could not be "anything more than one of its many attempts to preserve it competitive head start against Jackpot.com." SPA96 (citing Dkt.179_at_22, Dkt.185-50, Dkt.185-51). The court concluded: "The addition of '.com' to [Plaintiff's] logo *does bespeak bad faith*." SPA134 (emphasis added).

### E. The District Court's Decision

Plaintiff filed this lawsuit in July 2022 and brought a motion for a preliminary injunction, seeking to enjoin Jackpot.com from using its JACKPOT.COM mark. *See* Dkt.Sheet1, 19. The court held a two-day evidentiary

hearing on Plaintiff's motion, which included: (1) live testimony from each party's CEO; (2) declarations from two experts; and (3) additional evidentiary submissions. *See* SPA3. After the hearing, the court consolidated the preliminary injunction motion with trial on the merits. SPA3 (citing Dkt.179_at_347-48). The court conducted a bench trial in November 2022, which included: (1) a declaration of testimony from Plaintiff's Vice President of Marketing; (2) declarations from seven experts; and (3) additional evidentiary submissions. *See* SPA3-4.

In December 2022, the court issued its findings of fact (SPA4-49) and conclusions of law (SPA49-140). After analyzing the eight factors from *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), the court concluded Plaintiff had not shown likelihood of confusion.

The *first* factor, strength of the mark, favored Jackpot.com. SPA66-93. The court concluded that "the JACKPOCKET Marks are inherently weak" (SPA78) "because they incorporate the word 'jackpot,' the very purpose of a lottery, in a conspicuous manner," which is "best viewed as descriptive" (SPA70). "By joining 'jackpot' with 'pocket,' the mark conjures up an immediate sense of the essential part of the product." SPA72. The court confirmed this conclusion through Plaintiff's own advertising, "virtually all" of which "has focused on the 'jackpot,' not the 'pocket,' component of the mark." SPA73. "[W]idespread usage of the

term 'jackpot' in the lottery and gaming markets" additionally weighed against strength.  SPA75-76.

In addition, most of the relevant considerations showed Plaintiff had gained, at best, "limited acquired strength" (SPA84), and "neither Jackpocket's advertising revenues nor its sales success"—the vast majority of which were very recent—"provide probative evidence that the mark has acquired secondary meaning as associating its product with its source" (SPA81).  Thus, "the evidence of acquired strength is insufficient to overcome the inherent weakness of the JACKPOCKET Marks."  SPA93.

The **second** factor, similarity of the marks, "d[id] not cut in Jackpocket's favor."  SPA94-99.  Although it found JACKPOCKET and JACKPOT.COM are similar in sound and appearance based on the shared word "jackpot," the court applied this Court's precedent to rule that "shared use of this ordinary word, used to signify a virtue of the product, is not enough to render the two products 'confusingly similar.'"  SPA94 (quoting *RiseandShine*, 41 F.4th at 125).  The court found "a low likelihood of confusion," based both on "the two logos in context" as well as "[i]n context of their webpages."  SPA97-99.

The ***third*** factor, proximity of the products, favored Plaintiff because the parties intend to offer the same services: electronic purchase of lottery tickets.

SPA99-100.  Because there was no gap to bridge, the ***fourth*** factor was neutral. SPA100-101.

The ***fifth*** factor, actual confusion, favored Jackpot.com.  SPA101-120.  The court found that "numerous flaws" in Plaintiff's consumer survey "entitled [it] to little if any evidentiary weight."  SPA107, SPA120.  And as to Plaintiff's anecdotal evidence, such instances were "insufficient to show actual confusion" because: (1) they pre-date Plaintiff's announcement of entry into the U.S. market; (2) do not reflect relevant consumers' views; or (3) more likely reflect carelessness than confusion, and are at most *de minimis* (SPA102-05).

The ***sixth*** factor, Jackpot.com's good faith, favored Jackpot.com.  SPA120-122.  The court credited that:  (1) Jackpot.com operated a website under its mark for years, and so "it is logical, indeed expected" to continue that branding in the United States; and (2) its name describes its services.  SPA121.

The ***seventh*** factor, quality of Jackpot.com's products, was neutral because "there is nothing in the record to suggest that Jackpot.com's product will be of inferior quality."  SPA122-25.

The ***eighth*** factor, customer sophistication, favored Jackpot.com.  SPA125-26.  The court found that user registration for the parties' apps—*i.e.*, "the most relevant consumer decision"—"takes time and care as consumers enter personal

and financial information," during which they "exercise a high degree of caution." SPA126.

Balancing the *Polaroid* factors "holistically" to determine whether Plaintiff "demonstrated the probability of confusion of a substantial number of consumers of the relevant class," only one factor (proximity) favored Plaintiff. SPA126 (quotations omitted). The court concluded that "the JACKPOCKET marks are weak, suggestive marks, and Plaintiff has not demonstrated that the other *Polaroid* factors counterbalance the weakness of its marks." SPA126-27.

## SUMMARY OF ARGUMENT

The district court correctly found Plaintiff did not meet its burden to demonstrate consumers are likely to be confused between Plaintiff's and Jackpot.com's marks. Plaintiff challenges the court's findings on just three *Polaroid* factors, and identifies no error, let alone clear error, as to any of them.

**I.** The court correctly found that the similarity-of-the-marks factor "does not cut in [Plaintiff's] favor" based on the overall impression the parties' marks convey. The court properly discounted any similarity based on "jackpot" because the shared use of an ordinary word that signifies a product's feature is not enough. And it properly assessed the parties' logos and how they appear on their respective websites in concluding that the two marks, in context, have few similarities.

**II.** The court correctly found that the JACKPOCKET mark is inherently and commercially weak.

As to inherent strength, "[w]hen a mark so clearly evokes the claimed virtues of the product it references, that mark … is weak under the trademark law." *RiseandShine*, 41 F.4th at 121-22. Here, the record amply supports the court's finding that JACKPOCKET is inherently weak, including: (1) Plaintiff's admissions that it intended to, and took steps to, associate JACKPOCKET with "jackpot"; (2) evidence that consumers do associate JACKPOCKET with "jackpot"; and (3) evidence of widespread third-party use of "jackpot" in the lottery and gaming fields.

As to acquired strength, Plaintiff does not contest the court's findings on consumer surveys, unsolicited media coverage, evidence of plagiarism, or length and exclusivity of use, all of which indicate weakness. Moreover, the court correctly found Plaintiff's evidence of advertising and sales did not overcome the mark's inherent weakness because such (recent) figures largely reflected interest in the size of then-current jackpots, not Plaintiff.

**III.** The court correctly discounted Plaintiff's anecdotal evidence of actual confusion, finding instances of supposed confusion pre-dating Jackpot.com's entrance into the U.S. market were not probative, and the remaining instances did

not involve relevant consumers, had no connection to Jackpot.com's use of its name, or were *de minimis*.

***

"[W]eak marks are entitled to only an extremely narrow scope of protection, unless a convincing combination of other *Polaroid* factors militates strongly in favor of likelihood of confusion." *RiseandShine*, 41 F.4th at 124 (quotations omitted). Because Plaintiff made no strong showing, this Court should affirm.

## STANDARD OF REVIEW

"In reviewing the decision of a district court following a bench trial, [this Court] review[s] findings of fact for clear error and conclusions of law *de novo*." *Hamilton Int'l Ltd. v. Vortic LLC*, 13 F.4th 264, 271 (2d Cir. 2021).

Following a bench trial, "a trial court's findings as to each *Polaroid* factor are typically reviewed for clear error, with the court's weighing of those factors reviewed *de novo*." *Id.*; *see, e.g.*, *id.* at 279 ("We find no clear error in the District Court's factual findings … in connection with the *Polaroid* factors."); *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 137 (2d Cir. 1999) (cited in Br. 23) ("a district court's finding of fact as to each *Polaroid* factor is reversed only if clearly erroneous") (quotations omitted); *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995) (cited in Br. 23) ("We review the

district court's treatment of each *Polaroid* factor under a clearly erroneous standard.").

This deferential review applies to findings regarding: (1) similarity of the marks, *e.g.*, *Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633, 637 (2d Cir. 2017) ("finding was not clearly erroneous" that marks were "more dissimilar than similar"); *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 386 (2d Cir. 2005) ("The district court found that the marks lacked similarity. This holding was not clearly erroneous."); (2) strength of Plaintiff's mark, *e.g.*, *Joules*, 695 F. App'x at 637-38 ("no clear error in the finding that the strength factor favored MMG"); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077-78 (2d Cir. 1993) ("the finding by the district court that the 'parents' portion of the mark … was extremely weak was not clearly erroneous"); and (3) actual confusion, *e.g.*, *Joules*, 695 F. App'x at 637 ("finding was not clearly erroneous" that "actual confusion factor clearly favored MMG"); *Star Indus.*, 412 F.3d at 386 ("The district court found that the 'actual consumer confusion' factor militated against finding a likelihood of confusion. … [T]his holding was not clearly erroneous.").

Plaintiff's authorities (Br. 23-24, 35) applying *de novo* review to a court's assessment of a *Polaroid* factor largely did not follow bench trials. *See RiseandShine*, 41 F.4th at 119 (preliminary injunction); *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 335 (2d Cir. 2020) (summary judgment); *Tiffany & Co.*

*v. Costco Wholesale Corp.*, 971 F.3d 74, 86 (2d Cir. 2020) (summary judgment); *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 218 (2d Cir. 2003) (summary judgment). The one potential exception, *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 41-42 (2d Cir. 2016), hinted that review of a mark's categorization (*e.g.*, descriptive vs. suggestive) in assessing inherent strength "may involve" an issue of law; there is no dispute, however, over categorization here (SPA69 n.17).

"Under the clear error standard, [this Court] may not reverse a finding even though convinced that had [it] been sitting as the trier of fact, [it] would have weighed the evidence differently." *Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53, 63 (2d Cir. 2019) (cleaned up). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (quotations omitted). This includes deferring to the district court's credibility assessments, *Hamilton*, 13 F.4th at 271, its "choices among competing inferences to be drawn from the evidence, and its decision as to what weight to assign particular evidence," *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 54 (2d Cir. 2010).

## **ARGUMENT**

"[L]ikelihood of confusion turns on whether numerous ordinar[il]y prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Estee Lauder Inc. v. Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997) (quotations omitted). "[A] probability of confusion, not a mere possibility, must exist." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). In making this assessment, courts look to the eight *Polaroid* factors; this is not a "mechanical measurement" and "should focus on the ultimate question of whether consumers are likely to be confused." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001).

Unmentioned in Plaintiff's brief—but of crucial importance—"weak marks are entitled to only an extremely narrow scope' of protection, ***unless a convincing combination of other Polaroid factors militates strongly in favor*** of likelihood of confusion." *RiseandShine*, 41 F.4th at 124 (emphasis added) (quotations omitted). Plaintiff does not challenge the court's application of that law. SPA127. Nor does Plaintiff contest the court's findings on factors other than similarity, strength, and actual confusion, including factors that favored Jackpot.com (good faith and customer sophistication). Because Plaintiff fails to demonstrate the court erred— let alone clearly so—on the three challenged factors, nor that a "convincing

combination" of factors "militates strongly" in favor of likely confusion, this Court should affirm.

## I.   THE DISTRICT COURT CORRECTLY FOUND THAT THE PARTIES' MARKS ARE NOT SIMILAR

"In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr*, 991 F.2d at 1078. "[C]ourts should consider not simply the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 396 (2d Cir. 2021) (quotations omitted). Thus, "[t]he fact that the two marks appear similar is not dispositive. Rather, the question is whether such similarity is more likely than not to cause consumer confusion." *Brennan's Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004).

"[T]he shared use of [an] ordinary word, used to signify a virtue of the product, is not enough" to find similarity "without more striking visual similarities." *RiseandShine*, 41 F.4th at 124-25 (shared use of "RISE" in large bold letters not similar). Thus, while Plaintiff suggests (Br. 25) "less similarity" is necessary where parties offer similar services, it disregards that the sole similarity

here—reference to the descriptive word "jackpot"—is insufficient to establish similarity in the first place.[2]

Under the correct standard, the parties' marks, in context, are not similar. Plaintiff fails to identify any error, let alone clear error, in the court's findings.

## A. The District Court Properly Identified The Relevant Logos For Comparison

The court began its analysis by determining "which two logos to compare" (SPA95), concluding that "[t]he relevant comparison is … between Jackpot.com's [current] black logo and Jackpocket's blue logo, without the '.com' suffix." SPA96; *see* SPA14 (Plaintiff's "blue" logo: white text, blue background); SPA25 (Jackpot.com's current "black" logo: black coloring, white outline). In determining that "the appropriate comparison [is] to Jackpot.com's current logo," the court "credit[ed]" testimony from Jackpot.com that: (1) an initial, "short-lived" blue-and-white launch page was the decision of a third-party designer; (2) when brought to its attention, Jackpot.com voluntarily changed the scheme it to match its international color scheme; (3) Jackpot.com does not intend to use that blue-and-white scheme in the United States; and (4) Jackpot.com has since featured its black

---

[2] Plaintiff's cited cases (Br. 32) do not show otherwise. In *Playboy Enters. v. Chuckleberry Publ'g, Inc.*, 486 F. Supp. 414, 421 (S.D.N.Y. 1980), for example, the court found the word "play" in PLAYBOY and PLAYMEN was ***not*** used to "describe[] its common meaning," expressly distinguishing those marks from marks where "common words" are used in a "descriptive manner."

logo.  SPA95-96 (citing Dkt.175-142 (¶¶59-62, 89, 34); Dkt.178_231-32; Dkt.175-90(DX-015); DX-373).  The court also rejected Plaintiff's attempt to have its new "JACKPOCKET.COM" logo be a comparator, finding this was not a true change in branding, but rather a manufactured "attempt[] to preserve [Plaintiff's] competitive head start against Jackpot.com."  SPA96.  Neither of Plaintiff's challenges to this comparison is persuasive.

*First*, the court properly used Plaintiff's "blue" logo as its comparator. Plaintiff wrongly asserts (Br. 33) that the court "ignored multiple examples where" Plaintiff "does not depict its mark in its blue-and-white color scheme."  The court considered Plaintiff's position and determined, based on the record, the "blue-and-white color scheme continues to be the predominant logo."  SPA13.  That finding is not clearly erroneous.  *See supra* at 10; Br. 56-58 (examples of Plaintiff's advertising, website, and app using blue-and-white scheme).  Moreover, as Plaintiff acknowledges (Br. 33), the court recognized Plaintiff "does not always" use blue-and-white (SPA13 n.6).  In any event, Plaintiff does not argue any of its other colors schemes look like Jackpot.com's.

*Second*, the court did not clearly err (*contra* Br. 33-34) in finding Jackpot.com's short-lived and discontinued use of a blue-and-white color scheme was not an appropriate comparator.  That finding was supported by the record and the court's unimpeachable credibility determinations, with the court concluding

"[t]here is every reason to believe that Jackpot.com will continue to use this black template," consistent with its international branding.  SPA96.[3]

The court was well within its discretion to rely upon these credibility-based findings in determining the current black Jackpot.com logo is the appropriate comparator.  *Cf. Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 372 (S.D.N.Y. 2018) (comparing defendant's mark before alteration because defendant "continued to use its original logo" and thus "[t]here is reasonable expectation that [defendant] will continue to use and display its old logo").

## B. The District Court Correctly Found That The Marks, Considered In Context, Have Significant Material Dissimilarities

The court correctly found significant dissimilarities between the marks as they appear in the marketplace, including: (1) the logos "in context" are visually distinct in material ways, including coloring, arrangement, and capitalization;[4] and

---

[3]  This remains true today.  Plaintiff claims (Br. 34), without support, that Jackpot.com's website "return[ed] to a prior-used blue-and-white design."  The current website features Jackpot.com's black logo with a white outline and also features multiple colors, including a very dark blue (nearly black) that was not "prior-used," and Plaintiff does not even argue is "similar": it looks like the planned website the court considered (SPA99 (citing DX-373)), and nothing like the discontinued launch page Plaintiff complains about (PX-09).

[4]  "Plaintiff's logo is on a horizontal pla[ne] and consists of a combination of uppercase (the 'J,' 'Cs,' and 'Ks') and lowercase lettering, while Jackpot.com's logo is rounded and consists of a single uppercase letter, the 'J.'  Defendants' logo also prominently features the '.com' domain in a similar-sized font as 'Jackpot.'  The black coloring and white outline of Defendants' logo further separates the logo visually from Plaintiff's white font."  SPA97.

(2) the logos viewed "[i]n context of their webpages" have even "fewer similarities," with significant differences in color scheme, animation, slogans, and other "pieces of information." SPA97-99. [5] The court noted that "the dissimilarities … go beyond mere color choices when viewed in context." SPA98.

Plaintiff wrongly asserts (Br. 31) the existence of some textual or phonetic similarities must "decisively" tip this factor in its favor. That is not the standard; this "factor requires the court to look ***beyond the text*** of the mark and 'analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers.'" SPA94 (emphasis added) (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006)). That is just what the court did; indeed, it would be error to focus only on the text. *RiseandShine*, 41 F.4th at 124-25 ("not enough").

Thus, contrary to Plaintiff's position, courts routinely find that two marks "are not confusingly similar"—even when "the two names sound similar"—based on "the context in which a purchaser sees them." *Streetwise Maps*, 159 F.3d at 744-45 (STREETWISE and STREETSMART not similar) (citing cases); *see, e.g.*,

---

[5]  The marks are dissimilar in sound too: JACKPOT.COM has four syllables, while JACKPOCKET has three, and they only share the first syllable ("jack"), with different remaining words.

*Gruner + Jahr*, 991 F.2d at 1078 (PARENTS and PARENT'S DIGEST on parenting magazines "not sufficiently similar"); *Joules*, 695 F. App'x at 638 (JULES and JOULES); *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991) (no similarity where both marks "include as their focal point the words 'New Choices'"). Even when two marks are effectively identical, they can be dissimilar. *E.g.*, *Reply All*, 843 F. App'x at 396 (REPLYALL and REPLY ALL "are not so similar as to be likely to confuse consumers").[6]

Nor is Plaintiff correct in arguing (Br. 26-32) the court conducted an improper "side-by-side" comparison. *First*, Plaintiff misplaces (Br. 26-28) reliance on cases warning courts not to rely on side-by-side comparison to the ***exclusion*** of context. That is not what the court did here—it provided a complete analysis of the marks as they appear in the marketplace, first identifying the marks it was comparing and then analyzing them in context. *See* SPA97 ("[a]nalyzing the two logos ***in context***") (emphasis added); SPA97-98 ("***[i]n context*** of their webpages, moreover, there are fewer similarities") (emphasis added). Of course,

---

[6]   Plaintiff does not identify (Br. 31) any "obvious similarities" the court ignored. Plaintiff's authorities prove the point. *See Dooney & Bourke*, 454 F.3d at 117 (district court acknowledged "obvious similarities," but failed to compare them "in the context of the marketplace"); *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993) (differences were "minimal," with trade dresses bearing "striking similarities" in "various details" as well as "overall appearance … taken together").

any factfinder must compare the marks at issue: "A side-by-side comparison is a useful means of analyzing similarities in the respective designs, so long as the focus is on the ultimate issue of the likelihood of consumer confusion." *Joules*, 695 F. App'x at 638; *see Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005) (similar). Plaintiff's quarrel is not with the court's context-based inspection, but with the outcome.

*Second*, Plaintiff fixates (Br. 29) on one page of the opinion that includes images of the parties' logos. But those images merely follow the conclusion of "which two logos to compare." SPA95. After identifying them, the court analyzed the two logos and websites "in context." SPA97-98. This is hardly unusual—this Court routinely includes images of the relevant marks in its opinions. *See, e.g.*, *RiseandShine*, 41 F.4th at 118; *Joules*, 695 F. App'x at 635; *Nora Beverages*, 269 F.3d at 126-27; *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 44 (2d Cir. 2000).

*Third*, Plaintiff wrongly insists (Br. 29-30) the court "disregard[ed]" the marks as "spoken word[s]." The court found the marks "are similar in sound," and so plainly considered that feature. SPA94; *but see supra* at 30 n.5 (aural differences). But it determined that, in context, the marks do not convey a similar impression. Again, this is no different from other cases where two marks were found to not be similar despite aural similarities. *See supra* at 30-31. In any event,

there is no record evidence reflecting the extent to which consumers encounter the parties' marks aurally, or the effect such "spoken" uses would have.

*Fourth*, contrary to Plaintiff's contention (Br. 32), the absence of the literal word "jackpot" in its mark provides no basis to avoid this Court's precedent that sharing an "ordinary word, used to dignify a virtue of the product, is not enough" absent additional "striking visual similarities," *RiseandShine*, 41 F.4th at 125. The court considered and properly rejected this argument, finding JACKPOCKET conveys the descriptive word "jackpot" to consumers. SPA73. The court further found Plaintiff ***intentionally*** fostered an association between its mark and "jackpot," and so it cannot now disavow that association. *See supra* at 9-10. Indeed, that is the fundamental alleged similarity between the marks.

Any similarity in impression necessarily stems from Plaintiff's decision to have its mark "reference[] a ubiquitous [term] with which consumers are already likely to be familiar." *Reply All*, 843 F. App'x at 396 ("no confusing similarity" based on use of descriptive term) (citing *Cosmetically Sealed Indus. V. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) ("If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well[-]known descriptive phrase.")).[7]

---

[7]  Even if the court clearly erred in its similarity assessment (it did not), this Court should not remand on that sole basis (*contra* Br. 34) but instead hold the court

(*footnote continued*)

## II.  THE DISTRICT COURT CORRECTLY FOUND THAT THE JACKPOCKET MARK IS WEAK

A mark's strength "is often the most important factor." *RiseandShine*, 41 F.4th at 119.  This assessment "is based on either or both of two components": (1) inherent strength and (2) acquired strength.  *Id.* at 120.  Where a mark is inherently weak, a plaintiff must present evidence showing it has "achieved sufficient acquired strength to counterbalance [its] inherent weakness." *Id.* at 124. The court correctly found Plaintiff's mark is inherently weak (SPA78), and its evidence of acquired strength "is insufficient to overcome the inherent weakness" (SPA93).

### A.  The District Court Correctly Found That The JACKPOCKET Mark Is Inherently Weak

"To describe different degrees of inherent distinctiveness, the trademark law utilizes four categories[:] … (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *RiseandShine*, 41 F.4th at 120.  The court determined that, for the purpose of determining whether JACKPOCKET is ***protectable***, it is a suggestive mark.  SPA69-70 & n.17.

---

nevertheless properly balanced the *Polaroid* factors.  *See infra* at 64.  In *Dooney & Bourke*, 454 F.3d at 118, this Court remanded based on the similarity factor because it issued a "new standard."  In *MidCap Business Credit, LLC v. MidCap Financial Trust*, 2022 WL 17175400, *2 (2d Cir. Nov. 23, 2022), the district court had not "adequately" considered the remaining *Polaroid* factors.

Contrary to Plaintiff's suggestion (Br. 36), "[a] finding of suggestiveness does not guarantee a determination that the mark is a strong one." *RiseandShine*, 41 F.4th at 121; *see Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. Of Am., Inc.*, 307 F. Supp. 3d 260, 288 (S.D.N.Y. 2018) (Nathan, J.) ("that a trademark is the subject of a federal registration that has ripened into incontestable status does not support the conclusion that the mark is 'strong'") (quotations omitted). This is because "a mark can simultaneously exceed the threshold for establishing 'secondary meaning' and, thus, gain the protection of trademark law, while still being commercially weak." *Alzheimer's Found.*, 307 F. Supp. 3d at 289; *see Lang*, 949 F.2d at 581 ("suggestiveness is not necessarily dispositive … of the strength of the mark"). As the court recognized, a "trademark's inherent distinctiveness is a fact-intensive issue." SPA69 (quoting *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016)).

This Court addressed this issue in *RiseandShine*, where it found RISE BREWING COMPANY suggestive but inherently weak. 41 F.4th at 123-24. When a party chooses a mark that "evokes the claimed virtues of the product it references," that "does not favor giving one marketer an exclusive right to prevent others from using such valuable marketing terms in their own marketing campaigns." *Id.* at 122. The Court recognized that "rise" is "associated with the

morning, a time when many crave a cup of coffee," and "may also refer directly to energy itself[] after consuming caffeine." *Id.* This made the difference:

> The close associations between the word "Rise" and coffee constituted a weakness of the mark under the trademark law …. If the suggestion conveyed by a suggestive mark conjures up an essential or important aspect of the product, while the description conveyed by a descriptive mark refers to a relatively trivial or insignificant aspect of the product, the particular suggestive mark could be deemed weaker than the descriptive. Coffee's capacity to wake one up and lift one's energy, which is what the "RISE" mark suggests, is such an important part of the perceived virtue of coffee in the eyes of the consuming public as to render this suggestive mark decidedly weak.

*Id.* Similarly, because a "jackpot" is so "tightly linked with" and such an "important part of" the perceived virtues of lottery courier services—even more blatantly than the ephemeral word "rise" for coffee—the Court should affirm the finding that JACKPOCKET is inherently weak.

## 1. Substantial Evidence Supports The District Court's Finding Of Inherent Weakness

The word "jackpot" indisputably has a tight descriptive association with JACKPOCKET. Thus, the court correctly recognized the "logical association" between a "jackpot" and lottery courier services as weighing against strength. SPA70-75. Specifically, "by joining 'jackpot' with 'pocket,' the mark conjures up in an immediate sense the essential part of the product offered by [Plaintiff]." SPA72. The court explained:

> A "jackpot" is a key ingredient of any lottery—perhaps *the* key ingredient of a lottery—and describes the primary purpose of playing

36

the lottery. A consumer who buys a lottery ticket does not ordinarily view herself as merely buying a piece of paper with the name of the lottery contest and a distinctive set of numbers. … A lottery ticket is entry to a game in which the object is to win a "jackpot." … That is, customers can "quickly and easily grasp the nature of the product from the information conveyed" by the term JACKPOT.

SPA71. The record is replete with evidence showing the JACKPOCKET mark is inherently weak.

**Plaintiff's testimony.** The court credited "testimony at trial" reflecting the inherently weak nature of Plaintiff's mark. SPA75. It credited testimony, including from Plaintiff's CEO, that: (1) "investors, media organizations and consumers themselves associated Jackpocket by virtue of its name with the descriptive 'jackpot'"; and (2) when consumers search for "Jackpocket," many search for "jackpot" or "jackpot app," rather than "anything distinctive to Jackpocket itself." SPA75 (citing Dkt.175-22 (¶56)), SPA35-37, Dkt.59 App'x A). It also credited testimony that Plaintiff intentionally associates itself with "jackpot"; created and promoted its mark as conveying "a jackpot in your pocket"; and resides in the iGaming space, which is associated with jackpots. *Supra* at 7-12.

**Context.** The context in which Plaintiff uses its mark confirms its tight association with "jackpot." SPA72-73. "Jackpot" is the very first word a user sees on Plaintiff's app. SPA73. And "virtually all of Jackpocket's advertising has focused on the 'jackpot,' not the 'pocket' component of the mark." SPA73 (citing as examples Dkt.175-22 (¶¶25, 27, 54); Dkt.181-53).

**Visual and phonetic use.**  "The visual and phonetic similarity between 'Jackpocket' and 'jackpot' further emphasizes the association between the two terms."  SPA72; *see Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1153 (10th Cir. 2013) (SINUCLEANSE inherently weak: "[i]t is a term previously unknown in the English language, but it is plainly a composite of the common words 'sinus' and 'cleanse'").[8]

**PTO practices.**  The PTO "implicitly concluded" that "jackpot" is descriptive in connection with lottery and gaming services; for example, where a trademark application includes the word "jackpot," the PTO often will grant registration only "on the condition that the trademark owner ***disclaim*** the exclusive right to use 'jackpot' outside of the trademarks."  SPA71 (citing Dkt.49-10) (emphasis added); *see, e.g.*, DX-177.

**Widespread third-party use of "jackpot."**  "[W]idespread usage of the term 'jackpot' in the lottery and gaming markets" further showed that JACKPOCKET is weak.  SPA75-78.  For example, there are ***hundreds*** of registered trademarks in lottery and gaming spaces incorporating the word "jackpot."  SPA76; *see supra* at 7-8.  These registrations are independently

---

[8]   Plaintiff identifies cases (Br. 41-42, 47) where suggestive marks and "invented terms" were found to be strong, but none had the same level of evidence, as here, establishing a "strong logical association[]" with the relevant products. *RiseandShine*, 41 F.4th at 121.

probative of the mark's weakness. *See, e.g.*, *Car-Freshner*, 980 F.3d at 330 (BAYSIDE BREEZE: "breeze" "appears in thirty third-party registrations … and in the names of forty-seven other products in use"); *Streetwise Maps*, 159 F.3d at 744 (STREETWISE: "a trademark search revealed extensive use of the words 'street' and 'wise'"); *Estee Lauder*, 108 F.3d at 1511 (considering "more than 70" PTO registrations, applications, and filings "that incorporated the term '100%'").

The court also considered (SPA77) evidence of third-party use of "jackpot" in the lottery and gaming fields, including gaming-related apps and websites (*e.g.*, JACKPOT FUN, JACKPOT BASH, and JACKPOT CARNIVAL). SPA40-41, SPA76 (citing DX-214-23); DX-232-249. This includes direct evidence from a third party's business records showing ███████████ in revenue for the "casino-style" app JACKPOT MAGIC SLOTS. SPA77 (citing DX-281 (¶¶8-10); DX-274); *see supra* at 8. Such evidence confirms the weakness of Plaintiff's mark. *See RiseandShine*, 41 F.4th at 123 ("Extensive third-party usage of a mark in related products generally weighs against a finding that a trademark is strong"); *Streetwise Maps*, 159 F.3d at 743-44 (STREETWISE "not strong in the marketplace for maps" because "[o]ther map manufacturers" have used "street" in names); *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) (similar); *Lang*, 949 F.2d at 581 (similar). In this "crowded field," where "many companies use some variant of the term 'jackpot' to refer to their product, the

connection that a consumer would draw between the use of 'jackpot' and any particular source is necessarily diminished." SPA76-78 (citing cases).

Plaintiff wrongly asks (Br. 50-51) the Court to disregard this evidence because they do not involve the specific word "jackpocket." As the court explained (SPA77-78), the inquiry does not turn on whether others use an ***identical*** mark. In *RiseandShine*, this Court considered uses "of the term 'Rise'," 41 F.4th 112 at 122-23, not limiting its analysis to uses of "Rise Brewing Company." Likewise, *Streetwise Maps* found "third party use of the words 'street' and 'wise' weakens the strength of Streetwise's mark," 159 F.3d at 741-42, without requiring the exact term "Streetwise."[9] Nor does Plaintiff identify any legal rule precluding the court from weighing such evidence.[10]

---

[9] *See, e.g.*, *Gruner + Jahr*, 991 F.2d at 1079 ("strength of an incontestable registered trademark could be overcome by the use of a descriptive or weak ***portion*** of the mark") (emphasis added); *W.W.W. Pharm.*, 984 F.2d at 573 ("extensive third party use of the words sport and stick weighs against a finding that [SPORTSTICK] is strong") (cleaned up); *Lang*, 949 F.2d at 581 ("extensive third party use of the words 'Choice' and 'Choices'"); *WIZKIDS/NECA, LLC v. TIII Ventures, LLC*, 2019 WL 1454666, *7 (S.D.N.Y. Mar. 31, 2019) ("third-party marks resembling WIZKIDS").

[10] Plaintiff's older cases (Br. 50-51) demonstrate the fact-intensive, context-specific nature of the inquiry. *See Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988) ("the nongeneric components … must be compared in the context of the overall composite mark"); *Scarves by Vera, Inc. v. Todo Imps. Ltd.*, 544 F.2d 1167, 1173-74 (2d Cir. 1975) (defendant identified just seven third-party uses, and only one in same field); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d
(*footnote continued*)

***

Plaintiff's assertion (Br. 41-47) that the court "disregarded the substantial imagination necessary to associate JACKPOCKET with lottery courier services" glosses over this carefully considered evidence. Plaintiff's artificial list (Br. 43-47) of supposed "mental leaps" it posits an individual could undertake to associate JACKPOCKET with lottery courier services (compared to "rise" with coffee) contradicts the court's finding—supported by the evidence above—that "'jackpot' is more closely associated with lotteries than 'rise' is with coffee; the jackpot is itself the essence of a lottery, whereas 'rise' [is] only strongly suggestive of coffee." SPA75. "JACKPOCKET … conveys essential information about the nature of Plaintiff's product" (SPA69 n.17; *see* SPA70-79), which eliminates most if not all of Plaintiff's contrived steps. Because a "jackpot" is a "key ingredient" of lottery tickets, customers would "quickly and easily" make the exact connection Plaintiff fostered. SPA71 (quotations omitted). The weighty evidentiary record supports the court's finding that JACKPOCKET is inherently weak.

### 2. The District Court Considered The Proper Market And The Complete Mark

The court properly considered the strength of Plaintiff's mark in the "lottery and gaming markets." SPA75. This Court has never limited the inspection "to the

---

656, 661 (2d Cir. 1970) (assessing secondary meaning for validity, not strength, and considering whether third parties "promote[d] their 'trim' name").

narrow market in question" (SPA75 n.18)—here, lottery courier services—but rather looks to the full context of "competitive, nearly competitive, and other products," *Car-Freshner*, 980 F.3d at 330. Thus, it was "appropriate to look beyond the lottery courier services market—a nascent market with few competitors—to other similar gambling-related products." SPA76. Plaintiff's arguments are unpersuasive.

*First*, contrary to Plaintiff's assertion (Br. 39-40), the court considered JACKPOCKET in connection with lottery courier services. For example, it explained that "jackpot" is descriptive because even though it does not "immediately describe what a [lottery] courier service ***does***," it nonetheless communicates an "immediate idea" of a characteristic of the service. SPA70-71. The court further explained that a "jackpot" is associated with the purchase of a lottery ticket "either physically (through the piece of paper) or virtually (through a lottery courier service)." SPA71.

*Second*, Plaintiff disregards evidence showing its intent to use JACKPOCKET while "expand[ing]" into ***additional*** iGaming services" since at least 2015, and "made progress in its goal of expanding beyond lottery courier services" since 2018. SPA28-29; *see supra* at 11-12. In any event, just because lottery courier services are not identical to lottery operators does not mean they are

in separate industries.  *Contra* Br. 40.  Plaintiff's CEO admitted Plaintiff is in the online real money gaming industry.  Dkt.178_at_7-10.

*Third*, this Court's precedent permits consideration of related industries.  In *RiseandShine*, the plaintiff argued it was the "exclusive user of the principal term 'RISE' to identify a single-serving, canned caffeinated beverage," but this Court nonetheless found the mark weak based on third-party use of "rise" "in connection with coffee, tea, bottled beverages, energy drinks, soft drinks, drinkable health supplements, cafes, yogurts and granolas."  41 F.4th at 123; *see* SPA75-76 n.18.[11]

*Fourth*, Plaintiff wrongly argues (Br. 47-50) the court did not consider "JACKPOCKET could be associated with a wide array of goods and services."  To the contrary, it acknowledged that, "looking just at the language, a consumer has to … make an assumption about … whether it is related to lottery services or another gambling endeavor."  SPA70.  But it continued:  the question is whether, in this context, Plaintiff's mark "describes something about the product that the consumer is purchasing through Jackpocket."  SPA70.  The word "JACKPOCKET," it found, "conveys essential information about the nature of Plaintiff's product, even if some imagination is required to fully grasp its

---

[11] *See also, e.g.*, *W. Publ'g Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 60-61 (2d Cir. 1990) ("toy, game and paper products fields"); *Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801, 803 (2d Cir. 1973) ("candies" and "mints," not just "breath fresheners").

meaning." SPA69 n.17. Plaintiff's advertising campaign promotes that very association. Given that Plaintiff's service offers virtual purchase of lottery tickets, the court did not err—let alone clearly—in assessing the relative immediacy of that association and concluding "customers can quickly and easily grasp the nature of the product from the information conveyed." SPA71 (quotations omitted).

*Fifth*, Plaintiff misplaces (Br. 47-48) reliance on *Cross Commerce Media*, 841 F.3d 155, which, unlike here, concerned a mark (COLLECTIVE) with "comparably strong associations with a range of distinct enterprises that offer unrelated goods"—such as investment advisers, health insurers, banks, real estate brokers, and online ticket exchanges—and "might even bring to mind businesses that could ***themselves*** be called 'collectives,' such as collective farms or collective grocery stores." *Id.* at 164.[12] There is no such argument here.

*Finally*, contrary to Plaintiff's assertion (Br. 37-39), the court analyzed JACKPOCKET as a whole and did not "break" it "apart." The court assessed JACKPOCKET in context, which ***evokes*** "jackpot"—the very word Plaintiff claims is confusingly similar. As the court concluded, "the JACKPOCKET Marks emphasize their 'jackpot' core, both through the connection of jackpots to lotteries

---

[12] Plaintiff's other cited cases (Br. 44-49)—*Playtex Prod., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 164 (2d Cir. 2004) (WET ONES), and *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 (2d Cir. 1988) (GUNG-HO)—likewise concern marks that could have associations with many distinct enterprises.

and the visual similarity between 'Jackpocket' and "jackpot.'" SPA74-75. This is consistent with *RiseandShine*, where this Court focused on the word "rise" as the complained-of element, even though the plaintiff's mark was RISE BREWING COMPANY. *See* 41 F.4th at 121-24.

Plaintiff's attempts (Br. 38-39) to distinguish *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.,* 201 F. Supp. 3d 428, 443 (S.D.N.Y. 2016) (cited in SPA72), and *Oakland Chem. Co. v. Bookman*, 22 F.2d 930, 931 (2d Cir. 1927) (cited in SPA74-75), focus on the facts of those cases, rather than the legal rule they reflect: "additional letters that do not meaningfully change [a mark's] pronunciation, visual identity, or meaning to the average consumer" do not alter the inquiry. SPA74; *see Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 328 (1938) ("the mark 'Nu-Enamel' is descriptive of a type of paint long familiar to manufacturers, with the addition of the adjective new, phonetically spelled or misspelled"); J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION §11:31 (examples of "descriptive misspellings").[13]

---

[13] Plaintiff misreads (Br. 38) the court's opinion as treating JACKPOCKET as a "misspelling" of "Jackpot." The court identified misspellings as an example of an addition or omission of letters that would not affect strength. SPA74-75.

### 3. Plaintiff's Incorporation Of A Common Term Warrants A Narrow Scope Of Protection

The court also properly recognized that concerns over monopolization of common descriptive terms support a finding that Plaintiff's mark is weak. SPA127. "Trademark law does not offer robust protection to those who demand the exclusive right to use words that describe or suggest a product or its virtues." *RiseandShine*, 41 F.4th at 123.

This makes sense—the "first comer" to a new service does not get such a privilege because "[o]ther potential entrants share an interest in using such words in connection with the advertisement and sale of goods." *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 201 (S.D.N.Y. 2000); *see Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1211 (S.D.N.Y. 1979) (similar), *aff'd*, 636 F.2d 1203 (2d Cir. 1980). By seeking to preclude Jackpot.com from using "jackpot," Plaintiff effectively seeks to control that descriptive word. But "where the key word is free as air, small variations are likely to make enough of a difference to ward off charges of infringement." *Beech-Nut, Inc. v. Warner-Lambert Co.*, 346 F. Supp. 547, 549 (S.D.N.Y. 1972).

### B. The District Court Correctly Found The JACKPOCKET Mark Commercially Weak

In assessing acquired strength, courts consider multiple factors including: (1) direct consumer testimony; (2) consumer studies; (3) extensive unsolicited

media coverage; (4) attempts to plagiarize the mark; (5) the length and exclusivity of use; and (6) advertising expenditures and sales success of the mark as an identifier. *See, e.g.*, *Car-Freshner*, 980 F.3d at 329.

"[T]he more common the word and the more commonplace the manner of its usage in a trademark, the more difficult it is to displace the word's conventional significance so that it will be associated primarily in the public eye with the product." *Procter & Gamble*, 485 F. Supp. at 1197; *see Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 369 (E.D.N.Y. 2007) ("the more descriptive the term, the greater the evidentiary burden to establish secondary meaning") (quotations omitted). Judge Nathan, for example, found following a bench trial that ALZHEIMER'S ASSOCIATION was commercially weak, even though in just one year, plaintiff spent more than $44 million on advertising, had 9 billion media impressions and 41 million website visits, and raised more than $160 million in contributions. *Alzheimer's Found.*, 307 F. Supp. 3d at 289-90.

The court correctly found that Plaintiff's limited evidence of acquired strength did not overcome the mark's inherent weakness.

### 1. Plaintiff Does Not Challenge Most Of The District Court's Findings Against Acquired Strength

Plaintiff does not challenge most of the court's findings that underlie its conclusion that JACKPOCKET lacks commercial strength. These unchallenged findings alone demonstrate the court did not clearly err.

**Direct testimony.**  Plaintiff did not introduce direct testimony from any customer attesting to the strength of its mark, even though it had *months* to do so. *See Morgans Grp. LLC v. John Doe Co.*, 2012 WL 1098276, *7 (S.D.N.Y. Mar. 31, 2012) (plaintiff "failed to offer any consumer testimony").

**Consumer studies.**  "[C]ourts have long held that consumer surveys are the most persuasive evidence of secondary meaning" and thus commercial strength. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,* 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016), *aff'd* 720 F. App'x 24 (2d Cir. 2017).  The court determined— and Plaintiff does not challenge—that *both* parties' surveys are probative evidence of the *absence* of acquired strength.  SPA91-93.

**Unsolicited media coverage.**  Plaintiff "has not established evidence of secondary meaning through evidence of unsolicited media coverage."  SPA88. While Plaintiff trumpets (Br. 8-9) supposed "unsolicited" attention, the court *rejected* this evidence as unsupported and not probative, instead finding significant "how infrequent the references to Jackpocket's product" were.  SPA88-90; *see, e.g.*, *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, *12 (S.D.N.Y. Mar. 3, 2014) ("Isolated incidents of [plaintiff's] unsolicited media coverage in several industry-specific publications … are insufficient").

**Attempts to plagiarize.** Plaintiff "presented no evidence of plagiarism." SPA90. This weighs against acquired strength. *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 619 (S.D.N.Y. 2020).

**Length and exclusivity of use.** Plaintiff does not challenge the court's finding that Plaintiff's use "has not been consistent" or exclusive, including that "the vast majority" of use "has been since 2021." SPA85-88 (citing Dkt.175-59(Wong_Decl._Ex.2); Dkt.175-22 (¶15)); *see, e.g., Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 303 (S.D.N.Y. 2021) (seven years not "a sufficiently long time"); SPA86 (citing cases); *supra* at 38-41.

### 2. The District Court Correctly Found Plaintiff's Evidence Of Advertising Expenditures And Revenues Was Not Probative Of Acquired Strength

Plaintiff's challenge to the acquired-strength ruling is limited to the findings on advertising expenditures and revenues. But Plaintiff fails to identify any error in the court's determination that such "evidence is minimally probative of Jackpocket's acquired strength." SPA80.

Plaintiff disregards that "neither advertising nor sales success alone establishes secondary meaning." SPA80; *see* MCCARTHY §11:81. For example, "merely showing that a certain amount was spent on advertising provides little support for secondary meaning absent some demonstration that the advertisements caused consumers to associate the service with Plaintiff." SPA80 (quoting

*Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 319-20 (S.D.N.Y. 2012)); *accord RiseandShine*, 2023 WL 4936000, *7 (S.D.N.Y. Aug. 2, 2023); *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2012).  Advertising expenditures or sales revenue in a vacuum are thus uninformative without additional evidence connecting such figures to customer association.  *See, e.g., BigStar Ent.*, 105 F. Supp. 2d at 202 ("Plaintiff's purported expenditure to promote its business may evidence an effort to establish secondary meaning, but the outlay, by itself, gives no indication of the relative success of those endeavors.").

The court concluded Plaintiff's evidence of recent advertising and sales was not "probative evidence that the mark has acquired secondary meaning" on multiple grounds.  SPA81-84; *see supra* at 12-13.  Plaintiff's complaints are unpersuasive.

*First*, findings by some courts, in certain circumstances, that a plaintiff achieved acquired strength in a relatively brief time (Br. 52-54) did not require the district court to make that finding, especially when balanced against the other undisputed considerations above.  *RiseandShine*, 41 F.4th at 124.[14]  Courts

---

[14]  Plaintiff cannot distinguish (Br. 54-55) *RiseandShine* based on total advertising expenditures where it did not provide "context by which the Court can judge the extent or significance of its advertising sales" (SPA83-84); *see Alzheimer's*
*(footnote continued)*

routinely find acquired strength lacking after far longer periods. *See* SPA86; *supra* at 49. Particularly given that Plaintiff's mark is inherently weak, and thus requires stronger proof of acquired strength, its outlier cases have no relevance here.[15]

*Second*, Plaintiff fails to identify (Br. 55-63) any error in the court's determination that Plaintiff did not provide probative evidence its advertising was effective. The court's finding that most of Plaintiff's advertising consists of "traffic steering" was based on: (1) testimony from Jackpot.com's expert, which the court credited; and (2) advertisements presented by ***Plaintiff's*** CEO. SPA81 (citing Dkt.175-146 (¶28)); Dkt.175-22 (¶¶25, 27)). Contrary to Plaintiff's

---

*Found.*, 307 F. Supp. 3d at 289-90 (mark commercially weak, notwithstanding $44 million in advertising in one year).

[15] *See Charles of Ritz Grp. Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1319, 1321 (2d Cir. 1987) (arbitrary mark: sales "exceeded" $226 million, and "in excess" of $25 million spent on advertising "since 1978"); *Car-Freshner*, 980 F.3d at 329 (arbitrary mark: "considerable evidence of widespread recognition" with sales "in the tens of millions of dollars between 2013 and 2018"); *Reed Elsevier, Inc. v. Who's Who Worldwide Registry, Inc.*, 122 F.3d 1057 (2d Cir. 1995) ("continuously used the mark since 1899," with "millions" spent on promotion and advertising); *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013) (marks used since 1997, "the subject of widespread media coverage," "over $1.5 billion in sales from 2009 through 2011 alone," and hundreds of millions spent on advertising and promotion); *Dooney & Bourke*, 454 F.3d at 116 (pattern, "a famous indicator of Louis Vuitton for over a century," with "significant media attention" and millions in sales); *Original Appalachian Artworks v. Granada Elecs., Inc.*, 640 F. Supp. 928 (S.D.N.Y. 1986), *aff'd* 816 F.2d 68 (2d Cir. 1987) (sale of grey market goods; did not analyze *Polaroid* factors); *see also* SPA86 n.21 (distinguishing *Original Appalachian Artworks* and Plaintiff's other cases).

assertion (Br. 55-58), the court cited numerous authorities supporting the proposition that the mere existence of advertisements is not enough; they must ***also*** cause consumers to associate the mark with Plaintiff. *See* SPA80-81 (citing cases). [16] That advertising might lead consumers to places where Plaintiff's JACKPOCKET mark is visible (Br. 56-57) does not demonstrate it was effective in creating a ***mental association*** between the mark and its source. Plaintiff's out-of-circuit cases (Br. 55) are not explicitly about "traffic steering," nor do they dictate a different conclusion. *See Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1163 (9th Cir. 2021) (summary judgment in reverse confusion case: disputed facts on commercial strength); *GamerModz, LLC v. Golubev*, 2011 WL 4755026, *13 (M.D. Fla. Aug. 3, 2011) (summary judgment: "plaintiff clearly has not presented sufficient evidence from which a jury could reasonably find that GAMERMODZ had acquired secondary meaning").

---

[16] One of these cases, *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217 (2d Cir. 1987), clarified that what matters is not the size of advertising or marketing, but whether it is "effective in causing the relevant group of consumers to associate" the mark with the party. *Id.* at 1222. Plaintiff fails (Br. 61-62) to acknowledge that holding, nor does it successfully analogize that case to this one. Although *Centaur* concluded the mark had relative strength, it did so because there was a "small market," and it put significant weight on "findings of intentional copying of the mark" and its "duration and exclusive use," 830 F.2d at 1225-26—none of which is present here.

Plaintiff's suggestion (Br. 59-60) that this ruling "render[s] useless any advertising from brands whose business is to sell or deliver the goods of others" fails to grapple with the court's additional finding that Plaintiff's "more recent advertisements … focus heavily on the 'jackpot' message," including sometimes "at the expense of Jackpocket's mark." SPA14-16; *see* DX-385, DX-386 (examples); *see also* SPA81-82 (bodega's promotion of lottery tickets "merely advertises itself as a location" to purchase tickets, and "does little to build its store's brand"). Plaintiff likewise has no response to the finding that "most of Jackpocket's sales, like most of Jackpocket's advertising, appears to come during peaks in multi-state lottery jackpots," so Plaintiff's advertising and sales reflect that "consumers are drawn to the ***jackpot***," and do not establish association of the ***mark*** with Plaintiff. SPA83. *Bausch & Lomb Inc. v. Nevitt Sales Corp.*, 810 F. Supp. 466, 472 (W.D.N.Y. 1993) (cited in Br. 61), is inapposite as it merely noted a party's ***sponsorship*** of the Olympics as additional evidence of acquired strength; it did not credit evidence that sales of sunglasses spiked significantly only during the Olympics.[17]

*Third*, contrary to Plaintiff's assertion (Br. 63-66), the court rightly concluded Plaintiff failed to provide context for its advertising expenditures or

---

[17] Plaintiff's other cited cases (Br. 61 n.13) similarly concern evidence of ***sponsorship*** or ***promotion***, not crediting sales peaks.

sales success. Plaintiff still has not identified anything contradicting that "Jackpocket has offered no evidence about how its advertising expenditures compare" to the expenditures of others in the market. SPA83. Plaintiff can only state (Br. 64) it is a market leader—but this is insufficient. *See Fossil Inc. v. Fossil Grp.*, 49 U.S.P.Q.2d 1451, 1457 (T.T.A.B. 1998) ("better practice is not to rely merely upon sales and advertising figures, but also to submit, for example, consumer and trade testimony").

Nor did the court err (*contra* Br. 65-66) by considering Plaintiff's standing in the "lottery market generally." SPA84. Because Plaintiff was a "first-mover" in a new industry, had a near-monopoly in lottery courier services, and did "not provide[] context by which the Court can judge the extent or significance of its advertising" (SPA83-84), the court properly looked to information available. Nor does Plaintiff cite any authority requiring the court to restrict its analysis to the self-defined market of "lottery courier services," just as *RiseandShine* was not restricted to considering the narrow market of "single-serving, canned caffeinated beverage," 41 F.4th at 123. The court thus properly relied on *Capri Sun GmbH v. Am. Bev. Corp.*, 595 F. Supp. 3d 83, 155-56 (S.D.N.Y. 2022), and *Conn. Cmty. Bank v. Bank of Greenwich*, 578 F. Supp. 2d 405, 415 (D. Conn. 2008), for the

proposition that market-share assessment may inform the inquiry. SPA84.[18] And

the court rightly considered and rejected Plaintiff's evidence (*contra* Br. 66) of

supposed context within the lottery industry, as it reflected isolated snapshots of

"sales for a single Powerball jackpot" during a record streak, not "market shares of

the entire New York, Texas, and New Jersey lottery markets." SPA84 n.20 (citing

Dkt.175-85_at_127).[19]

## III. THE DISTRICT COURT PROPERLY DISCOUNTED PLAINTIFF'S EVIDENCE OF ACTUAL CONFUSION

### A. The District Court Applied The Correct Legal Standard For Actual Confusion

"[T]rademark infringement protects only against mistaken purchasing

decisions and not against confusion generally." *Lang*, 949 F.2d at 583 (quotations

omitted). Thus, "not all confusion counts: evidence of actual confusion must show

more than a fleeting mix-up of names; rather it must show that the confusion was

caused by the trademarks and it swayed consumer purchase." *Alzheimer's Found.*,

---

[18] Plaintiff fails to distinguish those cases. In *Conn. Cmty. Bank*, for example, the court considered the entire banking industry specific to Greenwich, *see* 578 F. Supp. 2d 405, 413-15, just as the court here considered the lottery market specific to New York, Texas, and New Jersey, SPA9. And in *Capri Sun*, the plaintiff actually provided specific market-share information. 595 F. Supp. 3d at 155.

[19] Plaintiff misreads the court's opinion in contending (Br. 66) it found downloads, revenue, and advertising figures for a third-party app "sufficient to demonstrate [its] commercial strength." Statements that other "jackpot" marks have "been used extensively in commerce" (SPA41) and Jackpot Magic Slots achieved "commercial success" (SPA77) were not evaluations of their strength to stop competitors from using the word "jackpot."

307 F. Supp. 3d at 293 (quoting *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017)).

Contrary to Plaintiff's mischaracterizations (Br. 69), the court did not limit evidence of actual confusion to "purchasing decisions"[20] or "mistaken completed transactions," a phrase the court never used. Rather, it accurately summarized this Court's precedent that the "*focus*" for "actual confusion" is not on consumers in general but on actual or potential purchasers of a good or service. SPA101. In doing so, the court rightly considered whether there was any confusion among relevant consumers, not in the abstract. Indeed, the court went beyond purchasing decisions, finding "there is no evidence that [Plaintiff's] examples [of supposed customer confusion] involve confusion about purchasing decisions *or any confusion[] about the source or affiliation of the products*." SPA103 (emphasis added, quotations omitted) (cleaned up). That standard follows this Court's precedent. *See Morningside*, 182 F.3d at 141 (cited in Br. 69-70) ("Morningside Group has demonstrated just such confusion *by its customers*") (emphasis added).

---

[20] Plaintiff misleadingly quotes and wrongly treats as error (Br. 69) the court's reference to "mistaken purchasing decisions," omitting that the court was directly quoting this Court's decision in *Lang*. SPA101; *Lang*, 949 F.2d at 583.

**B.    The District Court Properly Analyzed The Purported Instances Of Confusion**

The court properly considered—and rejected—Plaintiff's alleged anecdotal evidence of confusion, "conclud[ing] that these examples are insufficient to show actual confusion." SPA102. Plaintiff identifies no clear error.

As a threshold matter, the court correctly found Plaintiff failed to carry its burden to show any mistakes were "probative of the likelihood of confusion among customers." SPA105. Notwithstanding that Plaintiff claims (Br. 72) to have submitted "35 confusion instances," it provided ***no affidavit or testimony*** from any of those individuals to attest to whether she was confused by Jackpot.com's use. Plaintiff thus adduced no evidence that any mistake was anything more than a fleeting mix-up, a typographical error, or simple carelessness, none of which constitutes "actual confusion." *See, e.g.*, *Lang*, 949 F.2d at 582-83 ("It is not clear what prompted the error on the part of each caller."); *Joules*, 2016 WL 4094913, *11 (S.D.N.Y. Aug. 2, 2016) ("Plaintiff has offered no evidence to show whether these examples were the result of actual confusion or simply misspellings by the person posting."). Plaintiff's CEO ***admitted*** he did not know the causes of any mistakes in Plaintiff's examples. *See* Dkt.178_at_86-87. Considering Plaintiff's intentional selection of a mark that references the descriptive term "jackpot" in connection with lottery-related services, these individuals may have simply

misread "jackpocket" as the more common word "jackpot," without paying close attention or even knowing Jackpot.com exists. That is not actual confusion.

*Doral Conference Center Associates v. Southbury Hotel Associates*, 1987 WL 11173, *5 (S.D.N.Y. May 8, 1987) (cited SPA104), is instructive. There, the plaintiff identified instances where ARROWWOOD was mistakenly written as ARROWHEAD. But there was "no affidavit or testimony from any of the persons to the effect that the mistake was due to confusion caused by knowing about defendants' establishment." The court concluded: "It is likely that the mistakes were simply typographical errors, ***resulting from the fact that 'arrowhead' is a common word and 'arrowwood' very uncommon.***" *Id.* (emphasis added). The district court here was entitled to reach the same conclusion.

In any event, none of the supposed instances—which involved (1) non-customers pre-dating Jackpot.com's announcement of its U.S. launch; (2) customers who wrote to Jackpot.com's customer support email address; and (3) media reports or potential industry participants or partners after Jackpot.com's launch announcement—is probative of whether a potential consumer is likely to be confused by Jackpot.com's use of its name.

*First*, Plaintiff concedes (Br. 72-73) examples of "media, potential investors, social media users, and a singer" swapping "jackpot" for JACKPOCKET prior to

March 2022 (SPA102), is not actual confusion. Nor does it argue the court's assessment of that evidence was erroneous or provides a basis for reversal.

*Second*, the court properly concluded that emails "where customers wrote to support@jackpot.com" were not evidence they actually "confused Jackpot.com's product for Jackpocket's product or that they were likely to do so." SPA103. All but two emails **pre-dated** Jackpot.com's announcement of its U.S. launch, and so "are not probative of actual confusion" because they could not have been caused by Jackpot.com's use. SPA102-03. As to the two emails post-dating the announcement, the court rightly found: (1) just two emails are *de minimis* as compared to the "tens of thousands of emails" Plaintiff receives every year, *see Nora Beverages*, 269 F.3d at 124 (no error in finding two anecdotes *de minimis*); and (2) even on their own terms, the two emails "do not demonstrate that a consumer was aware of Jackpot.com's product and thought that Jackpot.com and Jackpocket were one and the same," SPA103. Rather, "the most logical explanation" is that Plaintiff "advertises itself as a jackpot [app] and has directed Google and Apple to direct consumers interested in obtaining a jackpot [app] to download Jackpocket's product." SPA104.[21]

---

[21] That ruling is not "at odds" with the court's finding on "timing" (*contra* Br. 75). The court properly discounted the probative value of years-old emails that had no connection to Jackpot.com's U.S. launch of lottery courier services, and found that, since the launch, the (at most) *de minimis* instances were "strikingly similar" to the

(*footnote continued*)

Jackpot.com's decade-plus use of its JACKPOT.COM brand online in Europe (*supra* at 5), does not render this evidence "particularly probative" (*contra* Br. 74-75) because Plaintiff has not shown any sender had even been aware of Jackpot.com's service, let alone that it caused the customer to be confused. SPA105. In contrast, *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249 (S.D.N.Y. 2006) (cited in Br. 74), involved the defendant's use of DE BEERS to sell diamonds, the defendant had "not begun to operate a website," and there was no question he was exploiting existing associations with the longstanding DE BEERS brand. *Id.* at 265, 279.

Plaintiff also quibbles (Br. 75-77, 81-82) with certain subsets of communications, including "support" emails, but identifies no clear error in the court's finding that Plaintiff did not show Jackpot.com's use of its mark caused these mistakes. *See supra* at 57-58. That some consumers "had multiple back-and-forth communications" (Br. 77-78) does not mean mistaken contact was not "carelessness," or that they were aware a business called "Jackpot.com" existed. And while Plaintiff takes issue (Br. 78-79) with the court's explanation of its email customer support system (SPA37), Plaintiff does not show how its nitpicking, even

---

examples before Jackpot.com's launch, indicating that any confusion was caused by "the weakness of the Jackpocket mark, not a risk that a consumer would download Defendants' application thinking that it was Plaintiff's." SPA105.

if accepted, provides any basis for reversal where the court did not find any of these old emails probative.[22]

*Third*, the court properly concluded the few examples "after Jackpot.com publicly announced its intent to enter the United States" did not concern relevant consumers. SPA104-06 (citing, *e.g.*, Dkt.181-72-78; PX-423; PX-424; DX-052; Dkt.175-104). That finding did not rest on the "fundraising" nature of these communications (*contra* Br. 80-81); for example, the court acknowledged baseball-related communications unrelated to fundraising (SPA104; *see* PX-423; PX-424), which Plaintiff wrongly claims (Br. 80) the court overlooked. And while Plaintiff attempts (Br. 81) to distinguish two cases the court cited, it does not contest the rule they apply: "[P]ersons [with] a pre-established personal or business relationship" with a plaintiff "are not representative of the typical consumer." *LVL XIII Brands*, 209 F. Supp. 3d at 672; *accord Jewish Sephardic*

---

[22] Contrary to Plaintiff's contention (Br. 81-82), the court properly addressed the probative value of various **groupings** of evidence, without dissecting every specific instance of alleged confusion. *See Alzheimer's Found.*, 307 F. Supp. 3d at 293-94. None of the *de minimis* supposedly "ignor[ed]" instances (Br. 81-82), for example, involved relevant U.S. consumers post-announcement. *E.g.,* PX-345 (2021 anonymous online review of non-U.S. website). And the court's discussion (Br. 78-79) of Plaintiff's automated emails and support email address is well supported, including by testimony from Plaintiff's CEO (Dkt.178_83-85) and Plaintiff's own documents (*e.g.*, Dkt.175-96(DX-032); PX-327; PX-353).

*Yellow Pages*, 478 F. Supp. 2d at 370.[23]  Plaintiff's effort (Br. 80) to analogize this case to *Morningside* fails because the financial professionals there **were** the consumers for the plaintiff's business.  182 F.3d at 141.

### C.    The District Court Properly Concluded This Factor Favors Jackpot.com

The court properly determined the actual-confusion factor favors Jackpot.com based on its finding that any anecdotal evidence of confusion was, at best, *de minimis*.  *See Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004) ("no error in concluding that this factor weighs in defendant's favor"); *Car-Freshner*, 980 F.3d at 332 (similar); *Streetwise Maps*, 159 F.3d at 745 (similar).

Nor does Plaintiff challenge the court's rejection of its confusion survey (SPA119-20), which independently favors Jackpot.com.  *See Star Indus.*, 412 F.3d at 387 (plaintiff's "failure to present its own consumer survey weighs against a finding of consumer confusion"); *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) (similar).  The court found Jackpot.com's confusion survey—showing just **0.4%** net confusion—"demonstrated sufficient weakness in [Plaintiff's]" survey to allow the court to conclude Plaintiff's "has little probative value."  SPA119-20.  Indeed, this 0.4% confusion rate is a "powerful indication"

---

[23]  *See, e.g.*, *Star Indus.*, 412 F.3d at 387-88; *27-24 Tavern Corp. v. Dutch Kills Central*, 2015 WL 5772158, *17 (E.D.N.Y. Sept. 29, 2015); *Brown v. Quiniou*, 744 F. Supp. 463, 472 (S.D.N.Y. 1990).

Jackpot.com's mark "does not cause a meaningful likelihood of confusion." *Easy Spirit LLC v. Skechers U.S.A., Inc.*, 571 F. Supp. 3d 185, 207-09 (S.D.N.Y. 2021); *see* MCCARTHY §32:189; *see also Ferran v. Town of Nassau*, 471 F.3d 363, 365 (2d Cir. 2006) ("we may affirm on any basis for which there is sufficient support in the record").

Plaintiff instead invents (Br. 68-69) a new rule that this factor can ***never*** favor a defendant that "only recently" entered the market. While Plaintiff identifies cases (Br. 68) where launch timing rendered this factor neutral, it cites no authority that a recent launch precludes finding this factor favors a defendant. Rather, this is a fact-specific assessment. Jackpot.com's mark had been used on the Internet, and was accessible in the United States, for over a decade before suit. The court was entitled to credit this evidence. *See, e.g.*, *WIZKIDS/NECA*, 2019 WL 1454666, *13 (factor favored defendant "even though sales … have been limited"); *Giorgio Beverly Hills, Inc. v. Revlon Consumer Prod. Corp.*, 869 F. Supp. 176, 185 (S.D.N.Y. 1994) (factor "favors defendant," even though it "has not yet begun marketing [product] in the United States").[24]

---

[24] None of Plaintiff's cited cases (Br. 68) involve a defendant's use of its mark in the United States for a ***decade***, nor activity comparable to Jackpot.com's after its launch announcement many months before trial. *See supra* at 6-7.

Even if this factor were weighed differently, Plaintiff does not show it would have made a difference. *Cf. Joules*, 695 F. App'x at 637 (assuming court "clearly erred" on one factor, affirming because "we agree with its overall conclusion as to the likelihood of confusion"); *W. Publ'g*, 910 F.2d at 61 ("even if we were to attribute greater strength to the mark than did the district court, we would reach the same ultimate conclusion"). In *RiseandShine*, on remand, the court entered summary judgment for defendant, even though "seventeen anecdotes," if fully credited, weighed "slightly" in plaintiff's favor. 2023 WL 4936000, *9. Likewise, Plaintiff does not make "a convincing" showing on this factor and others to "militate" "strongly in favor" of confusion. *RiseandShine*, 41 F.4th at 124 (quotations omitted).

## CONCLUSION

The judgment should be affirmed.

Dated: August 18, 2023

Respectfully submitted,

*/s/ William B. Adams*
William B. Adams
Todd Anten
Rachel E. Epstein
Dylan I. Scher
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Second Circuit Local Rule 32.1(a)(4)(A) because this brief contains 13,999 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: August 18, 2023

*/s/ William B. Adams*
William B. Adams

*Attorney for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2023, the PAGE PROOF BRIEF FOR DEFENDANTS-APPELLEES was electronically served on all parties or their counsel of record through the CM/ECF system, pursuant to Second Circuit Local Rule 25.1(h).

Date: August 18, 2023

*/s/ William B. Adams*
William B. Adams

*Attorney for Defendants-Appellees*